IRVING COHEN
233 Broadway, Suite 1800
New York, New York 10279
(212) 964-2544
Attorney for Plaintiffs
(IC 3708)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

FAYOLA ALEXANDER

                    Plaintiff,

                    -v-

CITY OF NEW YORK AND OFF. TYRONE F.
MICHAEL, INDIVIDUALLY AND AS A POLICE
OFFICER FOR THE CITY OF NEW YORK,
                    Defendants
-------------------------------------------------------------- x

COMPLAINT AND
DEMAND FOR
JURY TRIAL

14 CV

## INTRODUCTION

1. This is an action for damages for the wrongful acts of defendants NEW

YORK CITY and OFF. TYRONE F. MICHAEL of the New York City Police

Department, all acting under color of state law and pursuant to their authority, in

violation of plaintiff's rights under the Constitution and laws of the United States and

the State of New York.

2. Plaintiff Alexander alleges that beginning on or about May 14, 2012,

defendants committed wrongful and illegal acts against Plaintiff Alexander by

assaulting her, falsely arresting her in the course of which he used excessive force,

falsely imprisoning her, searching her, maliciously prosecuting her, and violating her

Federal and New York State civil rights.

## JURISDICTION

3. This action is brought under 42 U.S.C. Section 1983 in conjunction with the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and the constitutional, statutory and common laws of New York State.

4. Jurisdiction is invoked herein pursuant to the aforementioned statutory and constitutional provisions and pursuant to 28 U.S.C. Section 1331 and 1343, this being an action seeking redress for the violation of the plaintiff's constitutional and civil rights.

5. Plaintiff further invokes this Court's pendant jurisdiction over any and all state law claims and causes of action which derive from the same nucleus of operative facts that give rise to the federally based claims and causes of action, pursuant to Title 28, U.S.C. Section 1367.

6. Venue is laid within the United States District Court for the Eastern District of New York in that the actions complained of occurred in the Eastern District of New York.

## TRIAL BY JURY

7. Plaintiff demands a jury trial on each and every one of her claims as pled herein.

## PARTIES

8. At all times relevant hereto, plaintiff FAYOLA ALEXANDER was a resident of Brooklyn, New York.

9. At all times relevant hereto, defendant NEW YORK CITY was and is a municipality of the State of New York and owns, operates, manages, directs and

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

2

controls the New York City Police Department, which employs the other named defendant.

10. Defendant TYRONE F. MICHAEL is and was at all times relevant to this action a police officer, employed by the New York City Police Department, and acting under color of state law. He is being sued in both his individual and official capacities.

11. The conduct and injuries complained of herein ensued without any negligent or culpable conduct on the part of the plaintiff.

### NOTICE OF CLAIM

12. On February 28, 2013, plaintiff Alexander's Notice of Claim was filed with the Comptroller's Office of the City of New York. More than thirty days have elapsed since the filing of the Notice of Claim and this matter has not been settled nor otherwise disposed of.

13. On October 30, 2013, a hearing pursuant to New York State General Municipal Law §50-h was held at which time plaintiff Fayola Alexander was questioned by a representative of defendant New York City.

14. The transcript of this hearing is attached hereto as Exhibit A and as factual support for the causes of action alleged herein and is made a part of this Complaint.

### FACTUAL BACKGROUND

15. On May 14, 2012, Plaintiff Fayola Alexander was living and still lives at 726 East 95th Street, Brooklyn, New York, New York 11236.

16. Ms. Alexander lives at that address with her parents.

17. On May 14, 2012, she was 17 years old, her birth date being November 14, 1994.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

18. On May 14, 2012, Ms. Alexander was a student in her senior year at Sheepshead Bay High School.

19. She is now a college student.

20. On May 14, 2012, about 9:30 A.M., Ms. Alexander arrived by public bus to the vicinity of the high school, getting off at the bus stop on Nostrand Avenue.

21. She went to a bodega-type store where she dropped off her cell phone as such cell phones are not allowed in school.

22. The bodega had a business in which it would hold cell phones for the students while they were in school.

23. Ms. Alexander's first class that day was "government" which started at 10:40 A.M.

24. When she came out of the bodega, two officers approached her wearing uniforms and asked her for identification.

25. One of these officers was the defendant, Tyrone F. Michael.

26. She had seen these officers when she first went into the bodega.

27. Ms. Alexander gave the officer her school ID.

28. The officer then told her (and others) to get into a police van.

29. Ms. Alexander went into the van and waited.

30. She tried to explain to the officers that she was not late for school.

31. She waited in the van until it was full- about seven minutes.

32. The van then proceeded to the school- about two blocks away.

33. First in a group of ten, Ms. Alexander then entered the school which required walking through a metal detector.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

34. She placed her backpack on a belt, walked through the metal detector and started walking fast to get to her class.

35. Off. Michael, the defendant, ran after her and called to her to go to the lunchroom instead and sit down inside.

36. He then grabbed her on her neck and pushed her into the lunchroom.

37. She stumbled from the push and quickly walked to a table.

38. He continued to follow her, grabbed her and threw her to the lunch table, slamming her down.

39. Ms. Alexander's nose hit the edge of the table.

40. Her head was down and she was laying halfway on the table.

41. The defendant started pulling her hair.

42. She told him he was hurting her.

43. He then grabbed both her hands, put handcuffs on her and arrested her.

44. At no point did Ms. Alexander assault or bite the defendant in any way.

45. The defendant took Ms. Alexander to a back room in the dean's office.

46. She was crying and asked to call her parents but was not permitted to do so.

47. In that back room, defendant Michael picked Ms. Alexander up by her neck and threw her into a chair in the corner.

48. About fifteen minutes later, she was taken to the police precinct.

49. She was cuffed to a bar.

50. Defendant Michael fingerprinted and photographed her.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

5

51. She remained cuffed at the precinct for more than five hours and then taken by van to Central Booking.

52. A medical report was prepared by a person at Central Booking.

53. Ms. Alexander had a wound on the left side of her face and was bleeding.

54. She was then placed into a cell with other prisoners where she stayed overnight, about eight hours.

55. A Legal Aid lawyer told her she was being charged with a felony.

56. Defendant Michael had falsely claimed that Ms. Alexander swung her belt at him and resisted arrest.

57. She appeared before a judge and was released pending further proceedings.

58. She returned to court on another date and the case was adjourned to still another date.

59. On that next occasion, the case was dismissed and the records sealed.

60. As a result of the arrest, Ms. Alexander was suspended for the rest of the school year.

61. However, she was permitted to graduate with her class.

62. After her release in court, Ms. Alexander sought and received medical attention.

63. She had pain in her neck, head and nose.

64. She underwent an X-ray on her nose but it was not broken.

65. She attended therapy for a potential whiplash.

66. She went for eight weeks, twice each week.

67. She continues to experience headaches that often last for three days.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

6

68. Ms. Alexander was not late for her first class and would not have been late had she not been unreasonably and falsely detained by the defendant.

69. Ms. Alexander was a conscientious student who never exhibited any such anti-social or anti-authority actions as alleged by the defendant.

70. As a result of the unconstitutional and unlawful actions of the defendant, Ms. Alexander suffered and suffers from physical and emotional injuries.

71. She suffered the indignity of being suspended without true justification or cause on the eve of her graduation.

## COUNT ONE: VIOLATION OF CONSTITUTIONAL RIGHTS
### (Defendant Tyrone F. Michael)

72. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-71 of this complaint, as though fully set forth herein.

73. The acts, omissions and conduct of the defendant, a member of the New York City Police Department, and acting under color of state law, deprived plaintiff of her rights, privileges and immunities under the laws and Constitution of the United States; in particular the rights to be secure in her person and property, to be free from false arrest, false imprisonment, malicious prosecution, excessive force and cruel and unusual punishment and to due process.

74. By these acts, omissions and conduct, this defendant has deprived plaintiff of rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983, for which the defendant is individually liable.

## COUNT TWO: VIOLATION OF CONSTITUTIONAL RIGHTS
### (Defendant New York City)

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

7

75. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-74 of this complaint, as though fully set forth herein.

76. The acts, omissions and conduct of defendant New York City, as set forth above, deprived plaintiff of her rights, privileges and immunities under the laws and Constitution of the United States; in particular the rights to be secure in her person and property; to be free from unlawful seizure, false imprisonment, malicious prosecution; excessive force and cruel and unusual punishment and to due process.

77. By these acts, omissions and conduct, defendant New York City has deprived plaintiff of rights secured by the Fourth, Fifth, Eighth and Fourteen Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983.

### COUNT THREE: MONELL COMPLAINT

78. The allegations in paragraphs 1 through 77 of the complaint are repeated and re-alleged as if fully set forth herein.

79. The aforesaid constitutional violations were proximately caused by one or more policies, practices and/or customs of Defendant NEW YORK CITY, including but not limited to engaging in false arrests, malicious prosecutions, assaults, use of excessive force, fabricating evidence and perjury.

80. It was the policy, practice and/or custom of Defendant CITY OF NEW YORK to fail to train, discipline and/or supervise police officers so as to prevent them from engaging in these aforesaid unconstitutional actions.

81. Defendant CITY OF NEW YORK knew to a moral certainty that its police officers would confront situations conducive to these aforesaid unconstitutional actions.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

82. Defendant Tyrone F. Michael's actions were part of a pattern, practice and policy of the NYPD to ignore and violate the constitutional rights of the people with whom they come in contact.

83. Upon information and belief, defendant Tyrone F. Michael himself has engaged in similar unconstitutional actions that preceded the instant event which actions were known by the City of New York but with no disciplinary action taken.

84. The acts of Off. Michael were committed under his authority as a police officer of NYPD vested under and by virtue of the laws of the State of New York, and were, therefore, committed under the color of state law.

85. Defendant CITY OF NEW YORK knew of the need for additional screening, training, supervising and disciplining of police officers to refrain from the unconstitutional actions engaged in by Off. Michael.

86. Through intentional and deliberate indifference, the CITY OF NEW YORK failed to adequately provide for screening, training, supervising, and disciplining of police officers with respect to the above mentioned issues. This type of intentional misconduct and deliberate indifference is evidenced by decisions of the courts of the State of New York finding that the NYPD and its employees engaged in various acts of misconduct including but not limited to the unconstitutional acts alleged herein. These decisions include but are not limited to:

Riddick v. City of New York, 4 A.D.3d 242 (1st Dept. 2004)

Bonefant v. Kelly, 306 A.D.2d 108 (1st Dept. 2003)

Wagner v. Kerik, 298 A.D.2d 322 (1st Dept. 2002)

Seligson v. Kerik, 295 A.D.2d 262 (1st Dept. 2002)

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

Foy v. Safir, 277 A.D.2d 169 (1st Dept. 2000)

Titone v. Safir, 277 A.D.2d 161 (1st Dept. 2000)

Castro v. Safir, 277 A.D.2d 123 (1st Dept. 2000)

Mieles v. Safir, 272 A.D.199 (1st Dept. 2000)

Sannuti v. Safir, 261 A.D.2d 153 (1st Dept. 1999)

Brovakos v. Bratton, 254 A.D.2d 32 (1st Dept. 1998)

Ranalli v. Safir, 250 A.D.2d 507 (1st Dept. 1998)

Vasquez v. Safir, 250 A.D.2d 448 (1st Dept. 1998)

People v. Kenrick, 162 Misc.2d 75 (Crim. Ct., N.Y. Co. 1994)

Hickey v. Ward, 161 A.D. 495 (1st Dept. 1990)

People v. Bermudez, 2009 WL 382327 (Sup. Ct., N.Y. Co. 2009)

People v. Hidalgo and Lemus, Ind. Nos. 674/91, 12833/91 (Sup. Ct., N.Y. Co. Oct. 19, 2005)

87. Upon information and belief, police officers have not been disciplined by the Defendant CITY OF NEW YORK or NYPD for their misconduct, despite repeated judicial findings that NYPD police officers engaged in misconduct. Such failure to respond to and take corrective action with respect to wrongdoing by members of the NYPD constitutes deliberate indifference toward the constitutional rights of the accused, and such misconduct constitutes a practice, pattern and custom of engaging in police misconduct including, but not limited to the unconstitutional acts alleged herein.

88. By virtue of the judicial decisions referred to above, and other information and court decisions, NYPD and the CITY OF NEW YORK knew that the need for

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

10

adequate screening, training, supervising, and disciplining of its employees was and is compelling because of the overriding course of action of those police personnel including Off. Michael to make arrests, falsely prosecute and assault individuals with deliberate and total disregard for the truth and for the constitutional rights of those individuals.

89. But for the CITY OF NEW YORK's deliberate indifference in failing to adequately provide screening, training, supervision, and discipline of police officers and its affirmative acts, the innocent Plaintiff would not have been arrested, prosecuted nor assaulted.

90. As to these "Monell" claims regarding the NYPD, the aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well-established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and the rights established by the Constitution of the State of New York, including Plaintiff's right to be free from bad-faith prosecutions, her right to freedom from the deprivation of liberty without due process of law, and her right to be free from cruel and unusual punishment. Such misconduct by NYPD also directly and proximately caused Plaintiff's arrest, prosecution and physical injury from Off. Michael's assault.

91. The foregoing violations of Plaintiff's Constitutional rights, and the resulting and continuing injuries to plaintiff were further directly and proximately caused by Defendant CITY OF NEW YORK's deliberate indifference to the Constitutional rights of persons coming into contact with NYPD.

92. With respect to all of the wrongful actions and omissions alleged above, Defendant CITY OF NEW YORK knew to a moral certainty that its employees would confront such situations, that adequate screening, training, equipment, supervision, and discipline would have made the CITY's employees' choices less difficult, and there is a clear history of employees mishandling such situations, and that wrong choices by the defendant CITY's employees frequently result in deprivation of citizens' Constitutional rights.

93. The foregoing violations of Plaintiff's Constitutional rights comprised Constitutional torts and were affected by actions undertaken under color of law, statutes and regulations of the State of New York.

94. Off. Michael is also responsible personally and in his official capacity for the violation of said rights.

95. By reason of the foregoing, Defendant CITY OF NEW YORK is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for damages in an amount to be determined at trial.

### COUNT FOUR: FALSE IMPRISONMENT

96. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-95 of this complaint, as though fully set forth herein.

97. The acts, omissions and conduct of defendants, as alleged above, constitute false imprisonment under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

### COUNT FIVE: ASSAULT

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

98. Plaintiff repeats and re-alleges the allegations in paragraphs 1-97 of this complaint, as though fully set forth herein.

99. The acts and conduct of defendants, as alleged above, constitute assault under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

### COUNT SIX: MALICIOUS PROSECUTION

100. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-99 of this complaint, as though fully set forth herein.

101. The acts, omissions and conduct of defendants, as alleged above, constitute malicious prosecution under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

### COUNT SEVEN: RESPONDEAT SUPERIOR LIABILITY
### (Defendant New York City)

102. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-101 of this complaint, as though fully set forth herein.

103. At all times pertinent hereto, defendant was acting within the scope of his employment as an officer of the New York City Police Department.

104. Defendant New York City is thus liable under the doctrine of respondeat superior, for the intentional torts of the defendant, committed within the scope of his employment.

### COUNT EIGHT: NEGLIGENCE
### (Defendant Tyrone F. Michael)

105. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-104 of this complaint, as though fully set forth herein.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

13

106. The defendant, while acting as an agent and employee for New York City, owed a duty to the plaintiff to perform his duties without violating plaintiff's constitutional rights. Defendant's conduct constitutes negligence for which this defendant is individually liable.

### COUNT NINE: NEGLIGENCE
### (Defendant New York City)

107. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-106 of this complaint, as though fully set forth herein.

108. Defendant New York City owed a duty to plaintiff to adequately screen prospective police officers, and to train, supervise and otherwise control its police officers in the use of their powers incidental to their employment. Defendant New York City failed to provide adequate screening, training, supervision, and control of the individual defendants, which failure constitutes negligence.

WHEREFORE, plaintiff demands the following relief:

a. Compensatory damages in the amount of one million ($1,000,000 dollars).

b. Punitive damages in the amount of one million ($1,000,000 dollars).

c. Reasonable attorneys fees and costs; and

d. Such other and further relief as appears reasonable and just.

Dated: New York, New York
January 31, 2014

IRVING COHEN
Attorney for Plaintiff
233 Broadway, Suite 1800
New York, New York 10279
(212) 964-2544

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

14

# ORIGINAL TRANSCRIPT

1

50-H HEARING

- - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Claim of

FAYOLA ALEXANDER,

      - against -

THE CITY OF NEW YORK.

- - - - - - - - - - - - - - - - - - - - - - - - x

BLA#:   2013PI006207

                 160 Broadway
                 New York, New York

                 October 30, 2013
                 11:55 a.m.

      **EXAMINATION** of **FAYOLA ALEXANDER**, held at

the above time and place, pursuant to Notice,

taken before Jennifer Rodriguez, a reporter and

Notary Public within and for the State of New

York.

               LEX#100828



**LEX REPORTING SERVICE, INC.**
Professional Reporting Since 1980
Offices throughout New York and New Jersey • Toll Free 800-608-6085

2

A p p e a r a n c e s:


    IRVING COHEN, ESQ.
         Attorney for Claimant
         233 Broadway, Suite 2701
         New York, New York 10279



    DANIEL L SCHNEIDER, ESQ.
         Attorney for Respondent
         49 Walworth Avenue
         Scarsdale, New York, 10583
    BY:  KATE KARAKASSIS, ESQ.

```
 1                                          3
 2    F A Y O L A   A L E X A N D E R, the witness
 3              herein, having first been duly sworn by
 4              a Notary Public of the State of New
 5              York, was examined and testified as
 6              follows:
 7    EXAMINATION BY
 8    MS. KARAKASSIS:
 9         Q    State your name for the record,
10    please.
11         A    Fayola Alexander.
12         Q    State your address for the
13    record, please.
14         A    726 East 95th Street, Brooklyn,
15    New York 11236.
16         Q    Good morning Ms. Alexander.  My
17    name is Kate Karakassis.  I'm a lawyer.  I'm
18    going to be asking you some questions today
19    about your claim that you're making against
20    the City.
21              The reporter is here to take down
22    everything that you and I both say.  So it's
23    important that only one of us speak at a
24    time.
25              Please wait until I am completely
```

```
 1                        F. Alexander              4
 2      through asking my question, even if you know
 3      how it's going to end, before you start to
 4      answer.  Okay?
 5           A     Okay.
 6           Q     So you have to speak up nice and
 7      loud so we can get your complete answer.  And
 8      you have to answer in a word because the
 9      reporter can't make a record if you gesture
10      or nod your head or you go uh-huh or uh-uh.
11      Okay?
12           A     Yes.
13           Q     If I don't make myself clear and
14      you don't understand a question, let me know
15      and I'll rephrase it.  If you do answer a
16      question, we'll assume that you understood it
17      when you answered it.  Okay?
18           A     Yes.
19           Q     Could I please get your date of
20      birth?
21           A     11/4/1994.
22           Q     Okay.  And you are going to have
23      to speak up.
24                 And your Social Security number?
25           A     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.
```

```
 1                        F. Alexander           5

 2         Q      Now, are you claiming that you

 3    suffered physical injuries in this encounter

 4    with the police?

 5         A      Yes.

 6         Q      On that date did you have any

 7    kind of medical health insurance?

 8         A      Yes.

 9         Q      What kind of insurance did you

10    have?

11         A      I'm not sure.

12         Q      Was that through your parents?

13         A      Yes.

14         Q      And do you know your ID number?

15         A      No.

16         Q      We'll leave a place in the

17    transcript for you to provide the insurance

18    coverage and ID number

19    (INSERT):

20         Q      Do you know if you were getting

21    Medicaid coverage?

22         A      No.

23         Q      You don't know?

24         A      I'm not sure.

25         Q      Do you know if you were getting
```

```
 1                        F. Alexander              6

 2    Medicare benefits?

 3          A      No.

 4          Q      You're not sure, correct?

 5          A      Yes.

 6          Q      At the time of this incident,

 7    were you a student?

 8          A      Yes.

 9          Q      At what school?

10          A      Sheepshead Bay High School.

11          Q      And what grade were you in?

12          A      Twelfth.

13          Q      Had you been a student prior to

14    that school year at Sheepshead Bay?

15          A      Yes.

16          Q      Did you start there as a

17    freshmen?

18          A      Yes.

19          Q      How long have you lived at the

20    95th Street address?

21          A      For eleven years.

22          Q      And who do you live there with?

23          A      Mother and father.

24          Q      Your mother's name?

25          A      Silvina Alexander.
```

```
1                       F. Alexander              7

2           Q      Please spell Silvina.

3           A      S-I-L-V-I-N-A.

4           Q      And your father's name?

5           A      Omari Alexander, O-M-A-R-I.

6           Q      How tall are you?

7           A      5'7".

8           Q      And your approximate weight?

9           A      110.

10          Q      Is that about what you weighed on

11     the date of this incident?

12          A      No.

13          Q      How much did you weigh then?

14          A      105.

15          Q      Okay.  Are you right or

16     left-handed?

17          A      I am right-handed.

18          Q      Have you ever worn glasses or

19     contact lenses?

20          A      No.

21          Q      Have you ever been diagnosed with

22     any kind of vision disability or disease?

23          A      No.

24          Q      Were you in a regular class

25     program at Sheepshead Bay?
```

```
                        F. Alexander                    8
 1
 2           A      Regular.
 3           Q      Do you owe any money to New York
 4    City for anything such as liens, judgments,
 5    taxes, outstanding parking tickets?
 6           A      No.
 7           Q      Have you ever been convicted of a
 8    crime?
 9           A      No.
10           Q      Did you graduate from high
11    school?
12           A      Yes.
13           Q      Did you graduate from Sheepshead
14    Bay?
15           A      Yes.
16           Q      And what are you doing now?
17           A      College.
18           Q      Where do you go to college?
19           A      Medgar Evers.
20           Q      How do you like that?
21           A      It's good.
22           Q      Did you ever learn the names of
23    any witnesses to this incident with the
24    police, at the school, anybody who saw it
25    happen?
```

```
1                       F. Alexander              9
2           A    No.
3           Q    Do you know if any pictures were
4     taken while the incident was ongoing by
5     anyone with a cell phone or anything like
6     that?
7           A    No.
8           Q    You're not sure?
9           A    No.  I'm not sure.
10                    MR. COHEN:  School has a
11               video.  Sorry.
12                    MS. KARAKASSIS:  Do you want
13               to --
14                    MR. COHEN:  Yes.  Since my
15               office is moving, everything is
16               coming in at the same time, so
17               I'll just turn this down.
18                    So, just so you know, the
19               school has cameras recorded, some
20               of the incident.
21                    MS. KARAKASSIS:  Have you
22               obtained the tapes?
23                    MR. COHEN:  Yes.
24                    MS. KARAKASSIS:  Have you
25               forwarded copies to the
```

```
 1                    F. Alexander                10
 2                Comptroller?
 3                     MR. COHEN:  Sure.
 4                     MS. KARAKASSIS:  You have?
 5                     MR. COHEN:  No, no.  We
 6                haven't.
 7                     MS. KARAKASSIS:  Okay.
 8                     MR. COHEN:  I thought you
 9                said, will we.  At some time we
10                probably would.
11          Q    Okay.  Ma'am, I'll be asking you
12     more about the injuries you say you suffered
13     as a result of this incident.  Did you get
14     any medical treatment while you were in
15     police custody?
16          A    No.
17          Q    Did you get any medical treatment
18     at the school?
19          A    No.
20          Q    Did you seek medical treatment
21     after you were released from police custody?
22          A    Yes.
23          Q    When did you first go for any
24     kind of medical treatment?
25          A    On the 29th of May 2012.
```

```
 1                      F. Alexander              11
 2          Q       You have to speak up.  Of 2012?
 3          A       Yes.
 4          Q       And where did you go?
 5          A       Medcare.
 6          Q       And where is that located?
 7          A       On Flatlands in Brooklyn.
 8          Q       Did you just go once to Medcare?
 9          A       No.
10          Q       How many times did you go?
11          A       For eight weeks.
12          Q       Was that for check-ups or some
13     kind of therapy?
14          A       Therapy.
15          Q       Who recommended that you go to
16     Medcare?
17          A       My doctor.
18          Q       Which doctor was that?
19          A       Afam.  A-F-A-M.
20          Q       M as in Mary?
21          A       Yes.
22          Q       Is that the last name?
23          A       That's the name of the doctor.
24          Q       So, it's Dr. Afam?
25          A       Yes.
```

```
1                    F. Alexander            12
2          Q    Did you go see Dr. Afam?
3          A    Yes.
4          Q    Okay, so that's the first place
5   you went for medical treatment?
6          A    Yes.
7          Q    When did you see Dr. Afam,
8   approximately?
9          A    Around the 17th, 18th, yeah, of
10  May 2012.
11         Q    And Dr. Afam refer you to
12  Medcare?
13         A    Yes.
14         Q    Did you see any other doctors?
15         A    Yes.  For a scan, Doshi.
16         Q    Doshi Diagnostic?
17         A    Yes.
18         Q    On what location?
19         A    On Ralph.
20         Q    Was that for a CT scan?
21         A    Yes.
22         Q    Did you see other doctors or get
23  any tests anyplace else?
24         A    No.
25         Q    On the date of this incident did
```

                        F. Alexander                    13

1   you have any medical problems that were

2   ongoing; asthma, diabetes, anything like

3   that?

4        A     No.

5        Q     What parts of your body got

6   injured in this incident?

7        A     My neck and my nose.

8        Q     Before this incident with the

9   police, had you ever had any problems with

10  your neck or your nose?

11       A     No.

12       Q     Have you reinjured your neck or

13  your nose since this incident?

14       A     No.

15       Q     Are you claiming ongoing,

16  persistent emotional or psychological

17  problems because of this incident?

18       A     No.  Just once in a blue moon I

19  would get headaches.  Yeah.

20       Q     Okay.  Did you miss any school as

21  a result of this incident?

22       A     No.  Because I was suspended.

23       Q     For how long were you suspended?

24       A     Well, they suspended me to the

```
1                        F. Alexander              14
2      following year.
3           Q      Well, this incident occurred in
4      what month, May?
5           A      Yes.
6           Q      So, for the remainder of the
7      school year?
8           A      Yes.
9           Q      You were a senior when this
10     happened, correct?
11          A      Yes.
12          Q      When did you graduate from
13     Sheepshead Bay?
14          A      I graduated with my class.
15          Q      Did you have to take any make-up
16     classes though in the summer or the next
17     year?
18          A      No.
19          Q      Were you doing any type of
20     part-time work at the time of this incident?
21          A      No.
22          Q      Did you take any over-the-counter
23     or prescription medication in the twenty-four
24     hours before this incident?
25          A      No.
```

```
1                    F. Alexander            15
2          Q      Did you have any alcoholic
3    beverages in the twenty-four hours before the
4    incident?
5          A      No.
6          Q      Did you use any drugs in the
7    twenty-four hours before the incident?
8          A      No.
9          Q      Okay.  What was the date of the
10   incident?
11         A      May 14, 2012.
12         Q      And did the incident begin at
13   Sheepshead Bay High School?
14         A      Yes.  Two blocks from the school.
15         Q      About what time of the day did
16   the incident begin?
17         A      Around 10:20.
18         Q      In the morning?
19         A      Yes.
20         Q      Did you first have some contact
21   with the police at that time around two
22   blocks from the school?
23         A      Yes.
24         Q      This was a school day, right?
25         A      Yes.
```

```
 1                      F. Alexander          16
 2          Q     And what were you doing two
 3     blocks away from the school?
 4          A     I was on my way to school.
 5          Q     Just wait until I'm completely
 6     finished --
 7          A     Okay.
 8          Q     -- before you start to answer.
 9          A     All right.
10          Q     What time did classes begin for
11     you that day?
12          A     10:30, 10:40.
13          Q     That was your regular schedule?
14          A     Yes.
15          Q     Which class would you have taken
16     then at 10:40?
17          A     Government.
18          Q     And do you know exactly where you
19     were, what street you were on, about two
20     blocks from the school?
21          A     No.
22          Q     Were you walking from some place?
23          A     The bus stop, which is on
24     Nostrand.
25          Q     You're going to have to speak up.
```

```
 1                          F. Alexander              17

 2          A      The bus stop is on Nostrand and

 3    Avenue X.

 4          Q      Were you alone walking from the

 5    bus stop?

 6          A      No.

 7          Q      Who were you with?

 8          A      My friend.

 9          Q      What's your friend's name?

10          A      Zakiya.

11          Q      Can you spell that?

12          A      Z-A-K-I-Y-A.

13          Q      And what's her last name?

14          A      I'm not sure.

15          Q      Was she a classmate?

16          A      No.

17          Q      How old is Zakiya?

18          A      About that time, she was 18.

19          Q      Had she graduated from school

20    already?

21          A      Yes.

22          Q      Was she going to walk you to

23    school?

24          A      Yeah.  We came off the bus

25    together.
```

```
 1                        F. Alexander              18
 2          Q      And where was she headed to?
 3          A      School.
 4          Q      But she had already graduated?
 5          A      No.   She graduated with me.
 6          Q      So, she was a classmate?
 7          A      Yes.
 8          Q      At the school?
 9          A      Yes.
10          Q      Okay.   So the two of you were
11   walking along and what happened?
12          A      I went to the store to drop my
13   phone off.
14          Q      Which store did you go to?
15          A      I'm not sure the name of the
16   store.
17          Q      Was it some kind of phone store?
18          A      It was a regular corner store.
19          Q      Like a bodega?
20          A      Yes.
21          Q      And why were you dropping your
22   phone off?
23          A      Because we're not allowed to
24   bring phones to the school.
25          Q      And the bodega had a business --
```

```
1                         F. Alexander            19
2           A     Yes.
3           Q     -- holding the phones for
4      students while they were in school?
5           A     Yes.
6           Q     Okay.  So you made it to the
7      bodega.  Did you drop your phone off?
8           A     Yes.
9           Q     Did Zakiya go into the bodega
10     with you?
11          A     Yes.
12          Q     Did the two of you come out
13     together?
14          A     Yes.
15          Q     Did you purchase anything while
16     you were in the store?
17          A     No.
18          Q     So, the two of you come out of
19     the bodega and then what happens?
20          A     The officers was standing there
21     and asked for our IDs.
22          Q     Okay.  When you say officers,
23     were they wearing uniforms?
24          A     Yes.
25          Q     And how many officers?
```

```
 1                        F. Alexander              20
 2            A      There was two officers, but one
 3       asked me.
 4            Q      Had you seen them when you went
 5       into the bodega?
 6            A      Yes.
 7            Q      Had you passed by them when you
 8       went into the bodega?
 9            A      Yes.
10            Q      And did you give them some ID?
11            A      Yes.
12            Q      What did you give them as ID?
13            A      My school ID.
14            Q      And did Zakiya have some ID as
15       well?
16            A      The school ID.
17            Q      Then what happened?
18            A      We went inside the van and
19       waited.
20            Q      Why did you go inside the van?
21            A      Because they pick you up and take
22       you to the school building.
23            Q      Did the officers tell you to get
24       into the van?
25            A      Yes.
```

```
 1                     F. Alexander           21
 2        Q      Both of you?
 3        A      Yes.
 4        Q      Had you ever been stopped by the
 5   police before?
 6        A      No.
 7        Q      And the van, was it a marked van?
 8   Did it say NYPD on it?
 9        A      Yes.
10        Q      When the officers told you to get
11   in the van, did you say anything to them?
12        A      I told them that I'm not late for
13   school and they told me just give the ID.
14        Q      After you gave them your ID, did
15   they gave it back to you?
16        A      No.  They're truancy, they work
17   with the school.  So they pick up kids that's
18   late.
19        Q      When you passed by them going
20   into the bodega, did you know that they were
21   truancy police?
22        A      Yes.
23        Q      Had you seen them around before?
24        A      Yes.
25        Q      But they had never picked you up
```

```
 1                    F. Alexander              22
 2    before?
 3          A     No.
 4          Q     And had you been going to school
 5    with the first class scheduled to start at
 6    around 10:40 all year long?
 7          A     Yes.
 8          Q     Okay.  So, the two of you getting
 9    into the van, any other people in the van?
10          A     We had to wait until the van was
11    full.
12          Q     About how long did that take?
13          A     About seven minutes.
14          Q     Okay.  And then what happened?
15          A     We finally got to the school.
16          Q     The van drove to the school?
17          A     Yes.  Which is two blocks.
18          Q     Okay.
19          A     And then we went to scan in to go
20    into the building.
21          Q     The whole group of you?
22          A     Yes.
23          Q     And how many students in total,
24    approximately?
25          A     Around ten.
```

```
 1                        F. Alexander          23
 2           Q     Were you ever put in handcuffs
 3     while you were in the van at that time?
 4           A     No.
 5           Q     The ten students, you walked into
 6     the school?
 7           A     Yes.
 8           Q     When you say, "get scanned," what
 9     do you mean by that?
10           A     Walk through the scanners.
11           Q     Metal detectors?
12           A     Yes.
13           Q     And then what happens?
14           A     We was assigned to go to the
15     lunchroom.
16           Q     Somebody told you to go to the
17     lunchroom?
18           A     The police.
19           Q     The truancy officer?
20           A     Yes.
21           Q     The same ones that picked you up?
22           A     Yes.
23           Q     They told everyone to go to the
24     lunchroom?
25           A     After.  I was the first one that
```

```
1                    F. Alexander        24

2    got -- went through the metal detectors, so I

3    started going to class 'cause I've never been

4    through this process before.

5              Then he followed me and told me

6    to go to the lunchroom to sit down.

7        Q    Okay.  You walked through a metal

8    detector.  Did you wait for Zakiya to get

9    through before you started to walk to class?

10       A    No, because we have different

11   classes.

12       Q    After you got told to go to the

13   lunchroom, did you go to the lunchroom?

14       A    Yes.

15       Q    Did you speak to the officer,

16   tell him anything when he told you to go to

17   the lunchroom?

18       A    No.

19       Q    Okay.  You went to the lunchroom

20   and did everybody else in the group also go

21   to the lunchroom?

22       A    Well, they didn't come through

23   scanning yet because that officer that was

24   leading them was following me.  So they was

25   waiting for him to get back to the booth.
```

F. Alexander                    25

1

2      Q      Okay.  Did you go to the

3  lunchroom?

4      A      Yes.  I went to the lunchroom.

5      Q      Did the officer go with you?

6      A      Yes.  He followed me.

7      Q      Behind you?

8      A      Yes.  Because he thought I was

9  going to run out from another door.

10     Q      How do you know he thought that?

11     A      Because the force that he was

12  attacking me.

13     Q      When did he attack you?

14     A      Before I went in the lunchroom he

15  tried to grab my hand.

16     Q      So, as you were walking from the

17  detector to the lunchroom --

18     A      To go to class, because he didn't

19  assign us to go to the lunchroom.

20     Q      You said you were walking to the

21  classroom and then he told you to go to the

22  lunchroom.

23     A      Yes.  But he came after me and I

24  seen from the corner of my eye.

25     Q      Okay.  Wait.  I need to get the

```
 1                    F. Alexander              26
 2    time sequence correct.
 3                You walked through the metal
 4    detector?
 5         A    Yes.
 6         Q    Doesn't buzz or anything,
 7    everything seems okay, correct?
 8         A    Yes.
 9         Q    Correct?
10         A    Yes.
11         Q    Then you start to walk to your
12    classroom?
13         A    Yes.
14         Q    And as you're walking towards the
15    classroom, does the officer call out to you?
16         A    He calls out to me while he's
17    running to me.
18         Q    How far did you get before he
19    started to run to you?
20         A    Not too far.
21         Q    How many steps did you take?
22         A    About fifteen.
23         Q    Fifteen.
24                Did you hear the officer call out
25    to you when you had taken about fifteen
```

F. Alexander                27

2    steps?

3         A      Yes, because he was right next to

4    me.  He followed me.

5         Q      Did he walk or run behind you?

6         A      He runned.

7         Q      Did you hear his footsteps as he

8    was running towards you?

9         A      His keys.

10        Q      Okay.  So then he gets up and he

11   speaks to you at some point?

12        A      Yes.

13        Q      Where was the officer standing

14   when he spoke to you?

15        A      By my side.

16        Q      What did he say?

17        A      Go to the lunchroom.

18        Q      Did he touch you in any way at

19   this time?

20        A      Yes.  He grabbed me.

21        Q      Where did he grab you?

22        A      On my neck.

23        Q      Which hand did he use to grab

24   you?  Do you know?

25        A      I'm not sure.

```
1                    F. Alexander                28

2         Q    Just one hand?

3         A    Yes.

4         Q    Did he grab you by the front of

5    the neck, the back of the neck or from the

6    side?

7         A    The side.

8         Q    Which side of your --

9         A    My left.

10        Q    Did he touch any other part of

11   your body?

12        A    No.

13        Q    And when he touched your neck,

14   about how long did he hold on to your neck?

15        A    It was like he grabbed and he

16   pushed me inside the lunchroom.

17        Q    How far were you from the

18   lunchroom when the officer --

19        A    The door is right when he

20   approached me.  There's more than one door.

21        Q    Were you passing by the lunchroom

22   when --

23        A    Yes.

24        Q    You have to let me finish the

25   question.
```

```
1                        F. Alexander           29
2                 Were you passing by the lunchroom
3       to get to your classroom?
4            A    Yes.
5            Q    Now, you said there were several
6       doors to the lunchroom, correct?
7            A    Yes.
8            Q    Had you passed by one of those
9       doors before the officer came and as you say,
10      grabbed you by the neck?
11           A    Yes.
12           Q    How many doors had you passed
13      that lead to the lunchroom?
14           A    All five.
15           Q    Were you standing by a sixth door
16      that leads to the lunchroom?
17           A    The corner door, the last one.
18           Q    Was that the last sixth door?
19           A    Yes.
20           Q    At any time before you went
21      through the metal detector, had any officer
22      told you that you were supposed to go to the
23      lunchroom.
24           A    No.
25           Q    Had anyone told you that you were
```

```
 1                    F. Alexander              30

 2     supposed to go to the lunchroom from the time

 3     you passed through the metal detector until

 4     the officer showed up right next to you?

 5          A    No.

 6          Q    You said that officer had the

 7     left side of your neck?

 8          A    Yes.

 9          Q    And how did the officer push you?

10          A    It was just a push into the

11     lunchroom.

12          Q    Did he push you forward?  Did he

13     push you to the right side, to the left side

14     or backwards, or something else?

15          A    Forward.

16          Q    And when he pushed you forward

17     what happened to your body?

18          A    I stumbled and then I started

19     walking off with speed.

20          Q    And then what?

21          A    Started walking off with speed.

22          Q    Walking off, what do you mean?

23          A    From him to the lunchroom table.

24          Q    Did you enter the lunchroom?

25          A    Yes.  He pushed me into the
```

```
 1                       F. Alexander            31
 2    lunchroom.
 3           Q      So you started walking to a table
 4    in the lunchroom?
 5           A      Yes.
 6           Q      Okay.  And then what happened?
 7           A      Then he started following me and
 8    he grabbed me by my hand.
 9           Q      By which hand?
10           A      My left hand.  And threw me to
11    the lunch table.
12           Q      When you say throws you to the
13    lunch table?
14           A      He grabbed me and then slams me
15    to the lunch table.
16           Q      He grabbed your left hand?
17           A      Yes.  And he slammed me on the
18    table.
19           Q      When he slammed you, what do you
20    mean?  I'm not sure what you mean.  What
21    happened to your body?
22           A      He threw my body on the table.
23           Q      How did you touch the table?  How
24    did your body touch the table?
25           A      My nose hit the edge of the table
```

1                    F. Alexander            32

2     and I was basically laying halfway on the

3     table.  And that moment he was pulling my

4     hair.  And I was pulling forward, telling him

5     that you're hurting me and he was grabbing my

6     hand to arrest me.

7              Q    Which hand did he grab?

8              A    He grabbed both of my hands.

9              Q    And what did he do with them?

10             A    He arrested me.

11             Q    Did he put handcuffs on you?

12             A    Yes.

13             Q    Now, when the officer first

14    touched your neck, did you say anything to

15    him?

16             A    I told him don't touch me.

17             Q    Did you resist being --

18             A    No.

19             Q    Did you strike the officer?

20             A    No.

21             Q    Did you raise your hands to

22    threaten the officer?

23             A    No.

24             Q    Did you say anything to the

25    officer after you said, don't touch me?

```
1                      F. Alexander              33
2          A     No.
3          Q     When he, as you say, shoved you
4    into the lunchroom, did you say anything to
5    him?
6          A     No.
7          Q     After your face hit the table,
8    did you say anything to him?
9          A     I was telling him stop, you're
10   hurting me, because he was pulling my hair.
11         Q     Did you say anything else at all?
12         A     No.
13         Q     Was there anyone in the lunchroom
14   when this happened?
15         A     No.
16         Q     Do you know the name of the
17   officer?
18         A     Michael.
19         Q     Do you know his last name?
20         A     No.
21                    MR. COHEN:  Do you want it?
22                    MS. KARAKASSIS:  Yes.
23                    Off the record.
24                    (Whereupon, a discussion was
25               held off the record.)
```

```
1                    F. Alexander              34
2              MS. KARAKASSIS:  Counsel has
3         given me some documents
4         indicating the medical care
5         providers for the claimant.
6              The first one is Dr.
7         A-T-O-Y-N-A-T-A-N, his first name
8         is Ioanis, I-O-A-N-I-S.  And the
9         address is 5205 Church Avenue in
10        Brooklyn.
11             Okay and that doctor is with
12        Afam Comprehensive Health Care
13        Group (handing).
14             MR. COHEN:  So you're just
15        going to make a copy of those?
16             MS. KARAKASSIS:  Yes.
17   Q    Okay.  Ms. Alexander, when
18   Officer Michael told you to go to the
19   cafeteria, did you ever say, "I'm not going
20   to the fucking cafeteria, I'm going to
21   class"?
22   A    No.
23   Q    At any point did you bite Officer
24   Michael on the hand or arm?
25   A    No.
```

1                      F. Alexander          35

2          Q      Did you ever strike him with your

3      hands on any part of his body?

4          A      No.

5          Q      Did you ever use a belt or any

6      kind of belt-like instrument to strike

7      Officer Michael?

8          A      No.

9          Q      Did you take your belt off when

10     you were getting scanned?

11         A      Yes.

12         Q      And what did you do with the belt

13     after you were scanned?  Did you put it back

14     on?

15         A      I didn't get a chance to.

16         Q      You didn't stop and put it back

17     on after you got scanned?

18         A      No.  I didn't get a chance to.

19         Q      Where were you carrying it when

20     you walked away from the scanner?

21         A      It was in my bag and I started

22     taking it out.

23         Q      In what bag?

24         A      My bookbag.

25         Q      Your bookbag.  So you put it in

F. Alexander                          36

2  your bookbag?

3       A    Yes.

4       Q    And then you closed your bookbag

5  out?

6       A    Yes.

7       Q    Then you took fifteen steps?

8       A    Yes.

9       Q    Was that when you started to take

10  your belt out?

11      A    Yes.

12      Q    Okay.  Why were you taking your

13  belt out then?

14      A    Because I was putting it on.

15      Q    Why didn't you stop at the

16  scanner?  Why did you, I'm sorry, it just

17  seems, why did you put it back in your bag

18  instead of putting it back on right after you

19  got scanned?

20      A    No.  It was in my bag.  Before I

21  went in the scanner, I took it off to put in

22  my bag, as I was walking to class I was

23  taking it out of my bag to put it on.

24      Q    Is your back scanned separately

25  from you?

```
 1                      F. Alexander          37

 2          A     Yes.

 3          Q     So you put the belt into the --

 4          A     -- scanner and I went through the

 5   metal detector.

 6          Q     You put your belt into the bag?

 7          A     Bag.

 8          Q     You have to wait for me to

 9   finish.

10                You put your belt into the bag,

11   right?

12          A     Yes.

13          Q     Then you put your bag through the

14   scanner?

15          A     Yes.

16          Q     Then you separately walked

17   through the scanner?

18          A     Yes.

19          Q     Then as you were walking away,

20   you were taking your belt out of the bag to

21   put it on?

22          A     Yes.

23                     MR. COHEN:  Off the record.

24                     (Whereupon, a discussion was

25                held off the record.)
```

F. Alexander                    38

1
2        Q       Okay.  Now, before this incident

3    that you're making this claim for, had you

4    ever been suspended from school before?

5        A       No.

6        Q       No prior suspensions?

7        A       No.

8        Q       No principal's suspensions?

9        A       No.

10               MR. COHEN:  Are you sure

11           about that?

12               THE WITNESS:  No principal,

13           probably detention.

14        Q       Okay.  After you are handcuffed

15    in the lunchroom, what happened?

16        A       He took me --

17        Q       Officer Michael?

18        A       Officer Michael took me to the

19    deans' office which is down the hall from the

20    cafeteria.

21        Q       Do you know which dean that was?

22        A       Cayton, Mr. Cayton.

23        Q       Okay.

24        A       And there's separate rooms within

25    the deans' office.  He took me to the back

```
 1                     F. Alexander              39
 2      room and I was crying, asking my dean,
 3      because he's also my English teacher, if I
 4      could call my house.
 5           Q     So the officer took you into a
 6      back room in Dean Cayton's office?
 7           A     Yes.
 8           Q     And when you got there, was
 9      anyone else in the room besides you and the
10      officer?
11           A     Dean Cayton.
12           Q     You asked to call home?
13           A     Yes.
14           Q     What happened?
15           A     He said no.
16           Q     Who is he?
17           A     Dean Cayton.
18           Q     Did he tell you why you couldn't
19      call home?
20           A     No.  He didn't give me an
21      explanation.
22           Q     He, Officer Michael --
23           A     Yes.
24           Q     I can't hear you?
25           A     Officer Michael grabbed me by my
```

```
1                        F. Alexander                    40

2      neck.

3            Q      Again, in the deans' office?

4            A      Yes, twice, picked me up and

5      threw me in the corner.

6            Q      While Dean Cayton was present?

7            A      Yes.

8            Q      How did he pick you up?

9            A      By my neck.

10           Q      And he threw you?

11           A      Yes.

12           Q      How far, in terms of feet?

13           A      Like two feet.

14           Q      Into a corner you say?

15           A      Yes.  Into the chair that was in

16     the corner.

17           Q      Did you land in the chair?

18           A      Yes.

19           Q      Did he tell you to sit down

20     before he did this?

21           A      No.  He just put me in the room

22     so I was standing.

23           Q      So he took you in the room and

24     left you in a standing position?

25           A      Yes.
```

```
 1                    F. Alexander          41
 2        Q      And then later he approached you?
 3        A      Yes.
 4        Q      Grabbed you by the neck?
 5        A      Yes.
 6        Q      Threw you into the chair?
 7        A      Yes.
 8        Q      Then what happened?
 9        A      I just waited.
10        Q      Did Dean Cayton say anything to
11   you?
12        A      No.
13        Q      What happened while you were
14   waiting?
15        A      Security officers just came in
16   and told me to relax.  I just waited until
17   they took me to the precinct.
18        Q      Did anyone say anything to you
19   while you were in the room?
20        A      No.
21        Q      Did Dean Cayton stay in the room?
22        A      No.
23        Q      Did any security officer stay in
24   the room?
25        A      No.
```

```
1                         F. Alexander                  42
2              Q      Did Officer Michael stay in the
3       room?
4              A      No.  He went to the hospital.
5              Q      Do you know why Officer Michael
6       went to the hospital?
7              A      Because he said I bit him.
8              Q      Did you ever bite him?
9              A      No.
10             Q      Do you know how he got a wound?
11             A      When he was tackling with me that
12      could have been it and my bookbag got metal
13      on it.
14             Q      You didn't see that, you just
15      think that that's a possibility?
16             A      Yes.
17             Q      Okay.  How long did you wait in
18      that room?
19             A      I waited about fifteen minutes.
20             Q      Then what happened?
21             A      Then I was called to go to the
22      van.  Well, another police officer escorted
23      me to the van.
24             Q      The same van that you had come to
25      the school in?
```

```
 1                    F. Alexander         43
 2          A     I'm not sure if it's the same
 3     van, but.
 4          Q     A similar police van?
 5          A     Yes.
 6          Q     Where did the van take you?
 7          A     To the precinct.
 8          Q     Do you know which precinct?
 9          A     I'm not sure.  I think it was
10     69th.
11          Q     If you're not sure, we'll just
12     leave it.
13          A     Okay.
14          Q     And when you got to the precinct,
15     what happened?
16          A     They put me in a room, cuffed me,
17     one hand to a bar.  I waited for about
18     another hour until Officer Michael came back
19     to scan my fingerprints, picture.
20          Q     So the same officer that had been
21     involved in this incident at the school came
22     back and took your photograph and
23     fingerprinted you?
24          A     Yes, twice.
25          Q     What did he do twice?
```

```
 1                          F. Alexander                  44

 2          A      Fingerprints and photography.

 3          Q      When you got to the precinct,

 4    were you ever searched there, physically

 5    searched?

 6          A      No.

 7          Q      And about how much time did you

 8    spend cuffed by one hand to the bar?

 9          A      A good five hours.

10          Q      For five hours?

11          A      Yes, or more.

12          Q      Okay.  Maybe I misunderstood.

13    Because I thought, just a minute ago, you

14    said you waited there for about an hour, for

15    Officer Michael to come back?

16          A      For him to come, yes.  For him to

17    come do the fingerprints, but I was there for

18    five hours or more before they took me to

19    Bookings.

20          Q      Okay, I understand.  So you were

21    there for about an hour and then Officer

22    Michael came back and then you were put back,

23    handcuffed to the --

24          A      Yes.

25          Q      Okay.  When you were
```

```
1                      F. Alexander              45
2   un-handcuffed from the bar, where were you
3   taken?
4        A     I was taken to the van to go to
5   Bookings.
6        Q     To Central Booking?
7        A     Yes.
8        Q     When you got to Central Booking,
9   what happened?
10        A     I waited about fifteen minutes to
11   take another picture.  I sat down to do a
12   medical report.
13        Q     When you did the medical report,
14   was that an oral report or in writing?
15        A     Oral.
16        Q     Did you complain about any
17   problems to the person you spoke to?
18        A     Yes.
19        Q     What did you say?
20        A     I had a scar on my face and I was
21   bleeding.
22        Q     Where was the wound on your face?
23        A     On the left side of my face and
24   he had to make a report that he injured me
25   too.
```

```
 1                        F. Alexander            46

 2           Q      During the medical interview, who

 3      had to make a report?

 4           A      I had to make a report and they

 5      told the officer to make a report that he

 6      injured me too.

 7           Q      Was Officer Michael with you when

 8      you had the medical interview?

 9           A      Yes.

10           Q      Did Officer Michael take you to

11      Central Booking?

12           A      Yes.

13           Q      In a van or a car?

14           A      Van.

15           Q      Did anyone go with you in the

16      van?

17           A      Yes.  I'm not sure of the other

18      officer.

19           Q      So two officers escorted you to

20      Central Booking?

21           A      Yes.

22           Q      You had the medical interview and

23      you reported that you had a wound on the side

24      of your face?

25           A      Yes.
```

```
 1                      F. Alexander            47
 2          Q     Did you report anything else?
 3          A     No.
 4          Q     Did you ask for medical treatment
 5     then?
 6          A     No.
 7          Q     So after the interview what
 8     happened?
 9          A     I went to take another picture
10     then we waited.  They took me underground to
11     the other side.
12          Q     Were you put in a room or a cell
13     with bars?
14          A     Yes.  I was put in a cell with
15     bars.
16          Q     With other people?
17          A     Yes.
18          Q     Other women?
19          A     Yes.
20          Q     And how long did you wait in the
21     cell?
22          A     Overnight, which was about eight
23     hours.
24          Q     You waited in the cell until
25     when, the morning?
```

F. Alexander                    48

1

2        A       In the morning.

3        Q       About noon?

4        A       No.  I wasn't sure of the time.

5        Q       And the next morning did you see

6    a lawyer?

7        A       Yes.

8        Q       Was it the Legal Aid lawyer?

9        A       Yes.

10       Q       And did the Legal Aid lawyer tell

11   you what you were being charged with?

12       A       Yes.

13       Q       And what were you told?

14       A       Well, they showed me the paper of

15   all my charges.  It was a felony.

16       Q       You were being charged with

17   several things?

18       A       Yes.

19       Q       And then did you see a judge?

20       A       Yes.

21       Q       And then what happened when you

22   saw the judge?

23       A       When I went in to see the judge,

24   I didn't say anything.  The Legal Aid

25   explained and they told us the case was

1                          F. Alexander              49

2       continued.

3              Q      You got an adjourned date?

4              A      Yes.

5              Q      Then were you released?

6              A      Yes.

7              Q      About what time were you released

8       from jail that day, after you saw the judge?

9              A      10:30.

10             Q      In the morning?

11             A      Yes.

12             Q      And how many times did you go

13      back to court?

14             A      I went back on July, no, June

15      30-something, I wasn't sure.

16             Q      Did you just go back to court

17      once?

18             A      Yes.

19             Q      And what happened when you went

20      back to court?

21             A      They changed the date, I believe,

22      to another date.

23             Q      So then did you have to go back

24      again?

25             A      Yes.

```
 1                    F. Alexander            50
 2        Q    In total how many times did you
 3   go back to court?
 4        A    Twice.
 5        Q    What happened the second time?
 6        A    All the charges were dropped.
 7        Q    Were you told why the charges
 8   were dropped?
 9        A    No.
10             MR. COHEN:  Off the record.
11             (Whereupon, a discussion was
12             held off the record.)
13        Q    Did you hire a lawyer or did your
14   parents hire a lawyer to represent you?
15        A    Yes.
16        Q    Who was the lawyer?
17        A    Irving Cohen.
18             MS. KARAKASSIS:  And what's
19             the claim for legal fees today?
20             MR. COHEN:  $10,000.
21        Q    Did your parents pay the legal
22   fees, bills, that you know of?
23        A    Yes.
24             MR. COHEN:  Off the record.
25             (Whereupon, a discussion was
```

```
 1                      F. Alexander          51
 2                 held off the record.)
 3        Q       Did you appear at a suspension
 4   hearing?
 5        A       Yes.
 6        Q       The outcome was that you were
 7   suspended, correct?
 8        A       Yes.
 9        Q       But you were permitted to
10   graduate with your class?
11        A       At that time, no.  Then they were
12   sending work home for me to make up because I
13   wasn't able to attend the school that they
14   suspended me to because I had therapy.  Yeah.
15        Q       But you were permitted to
16   graduate with your class?
17        A       Yes.
18        Q       Okay.  And after you were
19   released by the judge, when did you first
20   seek medical treatment, how many days?
21        A       For eight weeks.
22        Q       No.  About how long was it after
23   your release that you first went for some
24   kind of medical treatment.  Did you wait a
25   day, go the same day, wait a week, something
```

```
1                          F. Alexander                52

2      else?

3            A      I waited a few days.

4            Q      And where did you first go?

5            A      To Afam.

6            Q      And when you went, what did you

7      complain of?

8            A      My neck was hurting me, headaches

9      and my nose.

10           Q      What about your nose?

11           A      It was hurting.

12           Q      Neck pain, nose pain and

13     headaches?

14           A      Yes.

15           Q      Anything else?

16           A      No.

17           Q      And when you went, you saw a

18     doctor there?

19           A      Yes.

20           Q      What did the doctor tell you

21     about your injuries?

22           A      That I might have whiplash and

23     for my nose, I had to get it scanned to see

24     if it was broken.

25           Q      Did you have an x-ray?
```

```
 1                        F. Alexander              53
 2           A     Yes.
 3           Q     Was your nose broken?
 4           A     No.
 5           Q     And did the doctors tell you you
 6     should have any treatment, prescribe any
 7     medication, anything like that?
 8           A     I can't remember.
 9           Q     You don't know if they told you
10     to take any pills or anything?
11           A     No.
12           Q     Did you just go to Afam once?
13           A     I went twice.
14           Q     When was the second time?
15           A     Two days after.
16           Q     Two days after the first visit?
17           A     After the first time, yes.
18           Q     Why did you go back?
19           A     To see if -- where could I be
20     referred to therapy.
21           Q     Why did you think you needed
22     therapy?
23           A     Because they told me it was
24     whiplash.
25           Q     So for neck therapy?
```

```
 1                    F. Alexander               54
 2         A     Yes, neck.
 3         Q     And where did they tell you to
 4   go?
 5         A     Medcare.
 6         Q     When did you start going to
 7   medcare?
 8         A     A week after.
 9         Q     How often did you go?
10         A     Twice a week for an hour.
11         Q     You went for eight weeks?
12         A     Yes.
13         Q     When you went, what did they do
14   for you?
15         A     I had exercises for my neck.
16         Q     They didn't do anything else for
17   you?
18         A     No.
19         Q     Why did you stop going?
20         A     Because the pain went away.
21         Q     You were better?
22         A     Yes.
23         Q     You said that somebody sent you
24   to Doshi Diagnostic for a CAT scan?
25         A     Yes.
```

```
1                      F. Alexander              55
2          Q      What part of your body?
3          A      For my nose.
4          Q      That shows that the nose wasn't
5     broken?
6          A      Yes.
7          Q      Did anybody ever give you any
8     treatment for the headaches?
9          A      No.
10         Q      You said earlier I think, once in
11    a blue moon you still get headaches?
12         A      They will last about three days.
13         Q      When you do it lasts for three
14    days?
15         A      Yes.
16         Q      And what do you do when that
17    happens, to treat them?
18         A      I take Advil, but that doesn't
19    work.
20         Q      Do you have any appointments in
21    the future to see any doctors because of your
22    physical injuries?
23         A      No.
24         Q      Okay.  And are you having any
25    other medical problems now because of this
```

```
 1                    F. Alexander              56

 2    incident?

 3         A    No.

 4         Q    Did you or anyone for you, like

 5    your attorney or your parents, contact the

 6    Civilian Complaint Review Board to report

 7    this incident or you're not sure?

 8         A    I'm not sure.

 9                    MR. COHEN:  Not as far as I

10               know.

11         Q    Did anyone from Internal Affairs

12    ever contact you concerning this event?

13         A    No.

14                    MR. COHEN:  Just one second.

15               Off the record.

16                    (Whereupon, a discussion was

17               held off the record.)

18                    MR. COHEN:  Okay.  Sorry.

19         Q    Now, when you were in police

20    custody did you ever ask for anything to eat

21    or drink?

22         A    Yes.

23         Q    Was water available to you at the

24    precinct house?

25         A    Actually Police Officer Michael
```

```
 1                    F. Alexander              57
 2    went and bought me something.
 3         Q    Did your parents come to the
 4    precinct house?
 5         A    Yes.
 6         Q    And when you got to Central
 7    Booking you were there overnight, right?
 8         A    Yes.
 9         Q    In the morning, did anyone offer
10    you any kind of breakfast?
11         A    No.
12         Q    How about anyone else in the
13    cell?
14         A    No.
15         Q    Do you know about what time you
16    were taken from the cell?
17         A    Around 11:00, 10:20.
18         Q    I thought you said that you were
19    released by the judge?
20         A    Yes.  Like around 10:30, then I
21    went into another room to talk to Legal Aid
22    and they took me.
23         Q    And were you allowed to use the
24    bathroom when you needed to?
25         A    At the Bookings?
```

```
1                    F. Alexander            58
2         Q     At the precinct and at Booking?
3         A     There's a bathroom within the
4    cell.
5         Q     Were you ever strip searched?
6         A     Yes.  I took off my shoes.
7         Q     Where was that, at Central
8    Booking?
9         A     Yes.
10        Q     Just your shoes?
11        A     Just my shoes.
12        Q     Okay.  And how do you feel about
13   this incident today?
14        A     I still think about it.  It's
15   scary.  Every time I get a headache that's
16   the first thing that comes to mind.
17        Q     Do you know, did anyone appeal
18   the suspension?
19        A     No.
20        Q     You don't know or you know that
21   they did not?
22        A     I don't know.
23              MR. COHEN:  We were happy
24              she graduated.
25              MS. KARAKASSIS:  Can we get
```

```
1                    F. Alexander           59
2          authorization for the release of
3          medical records today?
4               MR. COHEN:  No.
5               MS. KARAKASSIS:  So you'll
6          provide them directly to the
7          Comptroller?
8               MR. COHEN:  Yes.
9               Off the record.
10              (Whereupon, a discussion was
11         held off the record.)
12              MS. KARAKASSIS:  Mr. Cohen,
13         you were present at the second,
14         when the charges were dismissed,
15         right?  You were in court then?
16              MR. COHEN:  You know I don't
17         remember, but I think so.
18              MS. KARAKASSIS:  Do we know
19         why?
20              MR. COHEN:  There was no
21         action by the Grand Jury.
22              MS. KARAKASSIS:  That's it,
23         that's the whole thing?
24              MR. COHEN:  No action by the
25         Grand Jury and six months had
```

```
                          F. Alexander                    60

 1
 2       elapsed and time ran out.
 3           It would be my assumption
 4       that they looked at it and
 5       decided that there was no case.
 6           MS. KARAKASSIS:  I just
 7       thought you might know.
 8           MR. COHEN:  Not even a
 9       misdemeanor.
10           MS. KARAKASSIS:  Okay.  I
11       think that's it then.  Thank you
12       very much.
13           (Whereupon, the examination
14       of Fayola Alexander was concluded
15       at 1:08 p.m.)
16
17
18                 _____
                   FAYOLA ALEXANDER
19
20
21       Subscribed and sworn to
         before me this _____ day
22       of _____, 2013.
23
24       _____
         NOTARY PUBLIC
25
```

61

## C E R T I F I C A T E

I, JENNIFER RODRIGUEZ, a shorthand reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

JENNIFER RODRIGUEZ

```
                            F. Alexander                    60
 1
 2          elapsed and time ran out.
 3                   It would be my assumption
 4          that they looked at it and
 5          decided that there was no case.
 6                   MS. KARAKASSIS:   I just
 7          thought you might know.
 8                   MR. COHEN:   Not even a
 9          misdemeanor.
10                   MS. KARAKASSIS:   Okay.   I
11          think that's it then.   Thank you
12          very much.
13                   (Whereupon, the examination
14          of Fayola Alexander was concluded
15          at 1:08 p.m.)
16
17
18          FAYOLA ALEXANDER
19
20
21   Subscribed and sworn to
     before me this 25 day
22   of NOVEMBER , 2013.
23
24   NOTARY PUBLIC          PATRICIA SAMPSON
                            NOTARY PUBLIC-STATE OF NEW YORK
25                            No. 01SA6163896
                            Qualified in King County
                         My Commission Expires April 09, 2015
```

LEX REPORTING SERVICE
800-608-6085

1

2                          ERRATA SHEET

3

4       The following are my corrections to the

5       attached transcript:

6

7       PAGE     LINE     SHOULD READ

8       10    *  25      On the 15th of May 2012

9       11    *  5       AFAM Comprehensive Healthcare.

10      11    *  19      Dr. Ioanis Atoynatan

11      12    *  9       15th of May 2012

12      15    *  17      Around 9:20 and 9:30

13      16    *  12      9:40 am.

14      38    *  5,7     Yes., Yes

15      42    *  11      No.

16      43    *  9       61st. Precinct

17      52    *  3       The same day. May 15, 2012

18      53    *  8       Yes.

19      53    *  11      Yes

20            *  _____  _____

21            *  _____  _____

22            *  _____  _____

23            *  _____  _____

24            *  _____  _____

25